## IN THE UNITED STATES DISTRICT COURT DISTRICT OF NEBRASKA OMAHA DIVISION

| | |
|---|---|
| BJ'S FLEET WASH, LLC<br><br>                    Plaintiff,<br><br>vs.<br><br>TRANSIT AUTHORITY OF THE CITY OF OMAHA, NEBRASKA, d/b/a METRO AREA TRANSIT; GOODWILL INDUSTRIES, INC., Serving Eastern Nebraska and Southwest Iowa a Nonprofit Organization;<br><br>                    Defendant. | **8: 17- CV-23**<br><br>**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, DAMAGES, AND ATTORNEY FEES** |

COME NOW, the Plaintiff, BJ's Fleet Wash, LLC, brings this Complaint for declaratory judgment, damages, and attorney fees, against Defendants, Transit Authority of the City of Omaha and Goodwill Industries of Greater Nebraska, and plead as follows:

### THE PARTIES

1.      Plaintiff BJ's Fleet Wash, LLC ("BFW"), is a single-member, minority owned corporation created under the laws of the State of Nebraska, with its principle place of business in Omaha, Nebraska. It is owned and operated by an African-American resident of the State of Nebraska.

2.      Plaintiff BFW is a Nebraska taxpayer with interests in the unlawful expenditures of taxes by Defendant Transit Authority of the City of Omaha, Nebraska ("Metro").

3.      Defendant Metro is a governmental subdivision of the State of Nebraska, created by act of the Nebraska legislature, and doing business as Metro Area Transit.

4.      Defendant GOODWILL INDUSTRIES, INC., Serving Eastern Nebraska and Southwest Iowa a Nonprofit Organization ("Goodwill") is a charitable organization with

nonprofit tax-exempt status under section 501(c)(3) of the tax code and with its principle place of business in the State of Nebraska.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over the claims and the parties pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, inasmuch as this action is brought pursuant to 42 U.S.C. §§ 1981, 1983 & 1985(3); 42 U.S.C. §§ 2000d, *et seq.*; 42 U.S.C. §§ 2000e, *et seq.*; and the Fourteenth Amendment to the United States Constitution.

6.      This Court has supplemental jurisdiction over any state-law claims that may arise in the course of this litigation pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this Court under 28 U.S.C. § 1392(b), the acts complained of occurred in Douglas County, Nebraska, which is in the Omaha Division of the U.S. District Court for the District of Nebraska.

8.      This Court also is empowered to grant declaratory and corresponding injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## INTRODUCTION

9.      It is a hallmark of public procurements in Nebraska generally, and procurements by Metro in particular, that "All procurement transactions shall be conducted in a manner to provide, to the maximum extent practical, open and free competition." § 19.43 of 49 CFR Subtitle A.  Such fairness is necessary in order to preserve and protect the integrity of the procurement system.   When a prospective contractor is treated unfairly and unequally – when bias or favoritism deprives a prospective contractor of the rights to which it is entitled, the contractor, no less than the public itself, suffers serious injury.

2

10.     That is what happened here.  Plaintiff BFW was one of a number of companies that submitted a technical proposal to Metro for cleaning services. Metro then informed BFW that it could not submit a full proposal for a multimillion-dollar contract with Metro for the cleaning services for transit fleet interiors transit centers.

11.     Under the Master Agreement between Metro and FTA, Metro is required to use a procurement procedure that provides full and open competition and in compliance with Federal and State laws and regulations; instead, Metro chose to improperly apply the bid procedures— and allowed a known conflict of interest in this matter to continue unabated throughout the bid process—simply to ensure that Goodwill received the contract at the expense of, and to the detriment of, a minority-owned disadvantaged business enterprise (DBE).

12.     Metro, as a recipient of federal funds, was required to be proactive in attempting to solicit bids from DBEs such as BFW, as well as to comply with a variety of federal anti-discrimination statutes. Metro failed to meet these obligations, with such failure causing actual damage to Plaintiff.

## FACTS

13.     Metro is a Metropolitan Transit Authority, as that term is defined and explained in the Transit Authority Law, codified at Neb. Rev. Stat. §§ 14- 1801 through 14-1826. Metro was specifically created by ordinance of the City of Omaha in 1980, which stated, *inter alia*, "there is hereby created a transit authority for the city to be legally known and designated as the Transit Authority of the City of Omaha." *See* Code 1980, § 28-21. Metro was granted "all of the powers, rights and privileges and…all of the obligations and burdens provided by state law." *See* Code 1980, § 28-22.

14.     Pursuant to the Transit Authority Law, Metro is empowered to, *inter alia*:

a.      To make and enter into any and all contracts and agreements with any individual, public or private corporation or agency of the State of Nebraska, public or private corporation or agency of any state of the United States adjacent to the city of the metropolitan class, and the United States of America as may be necessary or incidental to the performance of its duties and the execution of its powers under the Transit Authority Law and to enter into agreements authorized under the Interlocal Cooperation Act or the Joint Public Agency Act (Neb. Rev. Stat. § 14-1805(8));

b.      To contract with an operating and management company for the purpose of operating, servicing, and maintaining any public passenger transportation systems of such authority (Neb. Rev. Stat. § 14-1805(9));

c.      To receive and accept from the government of the United States of America or any agency thereof, from the State of Nebraska or any subdivision thereof, and from any person or corporation, donations or loans or grants for or in aid of the acquisition or operation of passenger transportation facilities, and to administer, hold, use, and apply the same for the purposes for which such grants or donations may have been made (Neb. Rev. Stat. § 14-1805(12)); and

d.      To apply for and accept grants and loans from the government of the United States of America, or any agency or instrumentality thereof, to be used for any of the authorized purposes of the authority, and to enter into any agreement with the government of the United States of America, or

any agency or instrumentality thereof, in relation to such grants or loans, subject to the provisions hereof (Neb. Rev. Stat. § 14- 1805(18)).

15.     Metro, as a recipient of federal money through the Federal Transportation Administration ("FTA"), is party to a Master Agreement with the FTA, which is incorporated into this Complaint as Exhibit A, provides, in pertinent part:

a.      Pre-emption. The Recipient must comply with a Federal requirement if the Federal requirement pre-empts the conflicting State, territorial, local, or tribal requirement. *Page 37 of Complaint Exhibit A*

b.      That Metro agrees to establish and maintain "a written Code or Standards of Conduct" that includes a prohibition on "personal conflicts of interest, both real and apparent," which must apply to Metro's board members and their partners as well as to any person or entity who has "an interest in a present or potential third-party participant." *Page 42 Complaint Exhibit A*

c.      That Metro's mandatory code of ethics must prohibit the people listed in the previous subparagraph from participating in the selection for award of any third-party agreement involving a potential third-party participant in Metro's project; *Page 42 Complaint Exhibit A*

d.      That Metro understands and agrees that it must comply with Federal Civil Rights laws, including (but not limited to) compliance with laws prohibiting discrimination in transportation, discrimination in administration of the program and benefits, and discrimination in employment or business opportunities; and

5

e.      That Metro understands and agrees to comply with, *inter alia*, (1) Title VI of the Civil Rights Act of 1964; (2) 42 U.S.C. § 2000d, *et seq.*; (3) U.S. Dept. of Transportation ("DOT") regulations regarding nondiscrimination in federally-assisted programs as found in 49 C.F.R. part 21; (4) U.S. Dept. of Justice guidelines for enforcement of Title VI as found in 28 C.F.R. § 50.3; (5) Title VII of the Civil Rights Act, as amended; and (6) 42 U.S.C. § 2000e, *et seq.*

16.    Defendant Metro self-certified to the FTA that its procurement system complies with Federal law, regulations, State Law and requirements for FTA assisted third party contracts that recipient (Defendant Metro) undertakes and administers.

17.    In 1988, Charles Wilscam,[1] founder of the architectural firm that became RDG Schutte Wilscam Birge, Inc. ("RDG") joined the Board of Directors of Goodwill. Mr. Wilscam was named as a Lifetime Member to Goodwill's Board of Trustees in 2003, and he was inducted in Goodwill's Hall of Fame in 2008.

18.    Beginning in 1998, Goodwill teamed with RDG on every, or nearly every, building and/or remodeling project undertaken by Goodwill within its geographic territory including the Goodwill's retail store located at 2707 N. 144th St., Omaha, NE 68164.

19.    In 1999, RDG hired Metro Board Member Haase as a Community Planning Consultant.

20.    In 2005, Joseph Lang—a principal and director at RDG—joined Goodwill's Board of Directors, filling the seat previously held by Mr. Wilscam.

21.    Joseph Lang is currently on Defendant Goodwill Board of Directors.

---

[1] Mr. Wilscam is not a party to this matter.

22.     In total, RDG has had a presence on Goodwill's board for roughly twenty-eight (28) years and counting.

23.     On April 17, 2012, Haase was appointed to serve a five-year term on the Board of Directors of Defendant Metro.

24.     As of the date of Haase's appointment to the Metro board, RDG had one principal/director (Lang) on the board of Goodwill and one (Haase) on the board of Metro.

25.     Prior to 2009, Metro's fleet-interior cleaning services were provided by members of the General Driver & Helpers Union #554 under a collective bargaining agreement between the union and Metro.

26.     In or about 2009 or 2010, Metro and Union #554 agreed to let Metro outsource the cleaning of their bus shelters and transfer centers (*e.g.*, "passenger amenities"), and Metro and Goodwill entered into a contract to provide those services.

27.     As a condition of Defendant Metro participating in the federal program and receiving federal funding, federal law requires Defendant Metro to meet the requirements of the FTA Master Agreement, 49 U.S.C. chapter 53, 49 C.F.R. § 18.36 or 49 C.F.R. §§ 19.40 – 19.48, 49 C.F.R. Part 26 Subpart A §26.7(b); 49 C.F.R. Part 26 Subpart A §26.1(b) & (E); 49 C.F.R. Part 26 Subpart A §26.13(a.) and FTA Circular 4220.1 among others.

28.     Defendant Metro agreed "to conduct all its third party procurements using full and open competition as provided in 49 U.S.C. § 5325(a), and as determined by FTA".

29.     The FTA C 4220.1F, which is attached at Exhibit D specifically outlines the following:

a.      Defendant Metro must list specifically all evaluation factors and their relative importance are specified in the solicitation.

b.      Defendant Metro must obtain a "No Conflict of Interest" clause/statement that is signed by each person serving on the Evaluation Committee.

c.      Proposals are solicited from an adequate number (at least three) of qualified sources.

d.      Pre-Audit review conducted if a new (no projects with State in past) contractor is desired, prior to any announcement of project award.

e.      Must obtain price or rate quotations from an adequate number (at least three) of qualified (and potential) sources.

f.      Independent Cost Estimate… must make independent cost estimates before receiving bids or proposals. FTA C 4220.1F Ch. VI, 6.

g.      Defendant Metro shall not restrict competition:  Imposing unreasonable business requirements on firms in order for them to qualify to do business. Includes areas of Arbitrary Action and unnecessary business requirements and excessive bonding requirements.

h.      Solicitations shall incorporate a clear and accurate description of the technical requirements for the material, product, or service to be procured; identify all requirements that offerors must fulfill and all other factors to be used in evaluating bids.  FTA C 4220.1F,Ch.III, 3.d.(1)(c)

i.      Clear, Accurate, and Complete Specification. The solicitation and the contract awarded thereunder must include a clear and accurate description of the recipient's technical requirements for the property or services to be acquired in a manner that provides for full and open competition.   FTA C 4220.1F, Ch. VI, 2.a.

j.  Evaluations. When evaluating proposals submitted, FTA expects the recipient to consider all evaluation factors specified in its solicitation documents, and evaluated the proposals only on the evaluation factors included in those solicitation documents.  The recipient may not modify its evaluation factors after the proposals have been submitted without re-opening the solicitation. FTA C 4220.1F, Ch. VI. 7

k.  Evaluators.  In addition to evaluators with experience in technical or public policy matters related to the procurement, other evaluators may also include auditors and financial experts to the extent that the recipient determines would be necessary or helpful.  A recipient lacking qualified personnel within its organization may contract for the evaluation services it needs.  The procurement standards of FTA C 4220.1F will apply to those contracts and to those contractors selected to perform procurement evaluation functions on behalf of the recipient.

l.  Prior to Award.  Defendant Metro shall preform a cost (and/) or price analysis in connection with every procurement action, including contract modifications.  FTA C 4220.1f, Ch. VI, 6

30.  As it relates to the two-step procurement procedures, FTA C 4220.1. specifically, states Defendant Metro may use two-step procurement procedures in both sealed bid and competitively negotiated procurements, **provided the opportunity for full and open competition is retained**. In addition, Defendant Metro shall:

a.  <u>Review of Technical Qualifications and Approach</u>.  The first step is a review of the prospective contractors' technical approach to the recipient's

request and technical qualifications to carry out that approach. The recipient then may narrow the competitive range to prospective contractors that demonstrate a technically satisfactory approach and have satisfactory qualifications.

b. <u>Review of Bids and Proposals Submitted by Qualified Prospective Contractors</u>. The second step consists of soliciting and reviewing complete bids (sometimes referred to as "two-step sealed bidding") or proposals (as in "competitive negotiations"}, including price, submitted by each prospective contractor determined to be qualified. Absent exceptional circumstances, the recipient should attempt to solicit bids or proposals from at least three qualified prospective contractors. Unlike qualifications-based procurement procedures required for A&E services, and other contracts covered by 49 U.S.C. Section 5325(b), FTA expects the recipient to consider all bid or proposal prices submitted as well as other technical factors, rather than limiting reviews to the most qualified bidder or offeror.

## A.   FIRST REQUEST FOR PROPOSALS – PROJECT 08-13

31.   In 2013, Metro issued a Request for Competitive Proposals ("RFCP"), Project 08-13, for the cleaning of both its transit-fleet interiors and its passenger amenities, attached as Plaintiff Exhibit B.

32.   The RFCP Price Proposal Form was separated into two (2) Attachments/Projects; Attachment C, Cleaning Services - Transit Fleet Interiors and Attachment D, Cleaning Services - Transit Center and Bus Stop Shelters. The Price Proposal Forms (Attachments C and D) were

10

based on Unit Prices per category line item per year. Bidders had the option of bidding on either or both of the Attachments.

33.     In response, Metro received four proposals; three come from for-profit DBE small businesses, and the fourth came from Goodwill. All four bidders selected to bid on both Attachments.

34.     Plaintiff BFW submitted the RFCP response with the lowest price of the four proposals in Project 08-13. However, Metro's employees did not note this fact in their evaluation scores on the price-criterion portion of the RFCP analysis, and they determined that Goodwill scored the highest on the evaluation criteria. Accordingly, Metro employees recommended that the contract be awarded to Goodwill and requested authority from Metro's Board of Directors to make the award.

35.     On or about July 23, 2013, Plaintiff BFW filed a pre-award protest with Metro's Executive Director, challenging the award of the contract to Defendant Goodwill. This challenge was based on the incorrect scoring and flawed evaluation of the RFCP responses, as well as the conflict of interest caused by the overlap between Haase and Lang's board positions and positions with RDG.

36.     On or about July 30, 2013, Metro's Executive Director found that there was "no legitimate basis from which to take action" on BFW's protest, and he upheld the staff recommendation vis-à-vis Goodwill.

37.     On or about August 5, 2013, Plaintiff BFW then appealed the Executive Director's decision to Metro's Board of Directors. Specifically, Plaintiff BFW outlined the organizational conflict between Defendants Goodwill and Metro. Furthermore, Plaintiff BFW cited the following arbitrary and inconsistent scoring (citing many more than just these two):

a.  *Price.* Goodwill's overall score on the price criteria was 17.25; 8.50 on Attachment C plus 8.75 on Attachment D. The overall score for Plaintiff BFW's score on the price criteria was 15.25; 9.75 on Attachment C plus 5.50 on Attachment D. However, Plaintiff BFW actual overall proposal price combining both Attachments based on Metro's unit price bid tabulation is $105,733.10 lower than Goodwill's proposal for both Attachments on the base bid three (3) year contract term. Defendant Metro would further realize a $36,698.00 and $37,898.00 per year cost savings over the fourth and fifth year extension periods respectively with BFW'S proposal versus Goodwill's proposal. The total cost savings to Metro over a five-year period would have been $189,490.00.

b.  *Firm Qualifications and Experience.* Defendant Goodwill's overall score for Firm Qualifications and Experience was 119% higher than BFW'S, 19.75 points versus 9.00 points respectively. Plaintiff BFW has been servicing its clientele under North American Industry Classification System (NAICS) code 811192, (which is the NAICS code that Metro's cleaning services solicitation RFCP falls under), a full decade longer than Goodwill. Goodwill received an overall score of 19.75 out of a possible 20.00 points, Plaintiff BFW's overall score was 9.00 out of a possible 20.00 points.

38.   On or about August 23, 2013, Metro Board Chairman Michael Young stated in a letter to BFW that they did not see a conflict of interest, but that the RFCP requirements for Project 08-13 "could be clearer and improved upon," so Metro decided to reject all of the

responses to Project 08-13, rather than revise its evaluations and/or award the contract to Plaintiff BFW over Goodwill.

39.     Metro's August 2013 letter regarding Project 08-13 specifically stated, "A revised solicitation will be drafted and all parties involved, as well as any other eligible bidders, will have an opportunity to bid at time of issuance."

40.     After rejecting all bids, Metro allowed Defendant Goodwill to continue to operate as the contractor to clean of both its transit-fleet interiors and its passenger amenities under its previous contract. This lasted from August 2013 until June 2015, a twenty-two-month period

41.     Although Defendant Goodwill had the contract with Defendant Metro, Defendant Goodwill Specialty Services, has been getting paid monthly from Defendant Metro.

## B.     SECOND REQUEST FOR PROPOSALS – PROJECTS 03-15 AND 08-15

42.     In the early part of 2015, Metro decided to split the original RFCP from both cleaning its transit-fleet interiors and its passenger amenities into two different RFCPs, attached as Complaint's Exhibit C which is incorporated.

43.     In April 2015, Metro advertised an Invitation For Bids ("IFB"), Project 03-15, for the bus shelter and terminal (passenger amenities) cleaning portion of the previous Project 08-13, in which all proposals were rejected.

44.     The passenger amenities portion of Project 08-13 is much smaller in terms of contract value than the transit-fleet interior cleaning portion of that prior project. However, it does require more technical skills as it requires the contractor to be mobile, use different equipment, and be available or on call.

45.     Due to unnecessary requirements placed on bids for the project, only two bids were received on Project 03-15. One bid was from BFW, and BFW was awarded the contract.

46.     In May 2015, Metro advertised a Request for Proposals ("RFP"), Project 08-15, regarding the transit-fleet interior cleaning project that had been part of Project 08-13.

47.     On or about June 5, a pre-proposal conference was held.

48.     On or about June 22, 2015, Metro received two unpriced technical proposals in response to Project 08-15—one from Plaintiff BFW and one from Defendant Goodwill.

49.     As a result of the unpriced technical proposal, only one bid was given to Defendant Metro.

50.     During the technical evaluation phase, Defendant Metro requested more information from Plaintiff BFW and hired an independent consultant, Hayes and Associates, LLC, to audit and review Plaintiff BFW's information.  This same independent consultant did not perform the same audit and review on Defendant Goodwill's information.

51.     On or about July 2, Defendant Metro informed BFW that BFW's technical proposal was unacceptable and was no longer under consideration due to a failure by BFW to demonstrate adequate financial resources and capability to fully implement and perform the required services.

52.     FTA C 4220.1 specifically allows for allows for two step process only when it unduly restricted competition to one (1) respondent.

53.     Metro's staff evaluated the unpriced proposals and conducted oral interviews of BFW and Goodwill approximately one week later.

54.     Defendant Metro incorrectly mingled the minimum qualification (prerequisite) to the Technical Proposal evaluation step.

14

55.    This minimum qualification (prerequisite) is effectively the first step of a three (3) step evaluation procurement procedure (i.e., minimum qualification evaluation, unpriced Technical Proposal evaluation. and Sealed Bid Price Proposal evaluation

56.    Goodwill, on the other hand, was invited to submit a bid.

57.    During the thirty-five (35) calendar days between Project 03-15's Contract being awarded to Plaintiff BFW and Project 08-15's unpriced Technical Proposal's elimination, there was no significant change in Plaintiff BFW's financial position.

58.    On July 7, 2015, BFW submitted a technical-proposal protest to Metro's Executive Director.

59.    The following day, July 8, 2015, Metro's Executive Director denied BFW's request to rescind the elimination of BFW's proposal from consideration in Project 08-15.

60.    On July 23, 2015, Metro staff requested authority from Metro's Board of Directors to award the contract in Project 08-15 to Defendant Goodwill. Because Director Michael Young voted against awarding the contract to Goodwill, and because Director Jay Lund was absent, the contract could not be awarded to Goodwill without Haase's vote.

61.    The Board of Directors approved Goodwill's contract by a vote of three (3) yeas, one (1) nay, and one (1) absent. Board Member Haase, sitting as chair of Metro's Board at the July 23 meeting, voted to award the contract to Goodwill, despite the appearance of a conflict of interest in the long-standing relationship between her engineering firm and Goodwill.

62.    The value of the contract awarded to Goodwill was roughly $1.4 million.

63.    By not awarding the 2013 bid for both its transit-fleet interiors and its passenger amenities under its previous contract, and denying the opportunity for Plaintiff BFW to even bid on Project 08-15,

15

64.     Defendant Metro did not have objective data to support not awarding the contract to Plaintiff BFW beyond surmise, guesswork, discrimination, or gut feeling.

65.     Contrary to law, the RFP and the scoring methodology were not conducted in the manner prescribed by the technical proposal and RFCP, in the following particulars, among others:

a.      Defendant Metro selectively permitted evaluators to add an independent consultant and CPA to audit and review Plaintiff's BFW financials but not any other bidder;

b.      Defendant Metro's evaluation of Plaintiff's technical proposal, including Defendant Metro's identification of deficiencies therein, was arbitrary and capricious, lacked a rational basis, and violated state and Federal regulations and procedures;

c.      Defendant Metro confused a Pre-Audit review with the two step procurement process;

d.      Defendant Metro used evaluation criteria not developed simultaneously with the development of the technical proposal and the RFPs—in both 2013 and 2015;

e.      Defendant Metro evaluated responses to the technical proposal and the RFPs according to criteria developed in response to the protests to the Project 08-13 and 08-15, not the originally stated criteria;

f.      The evaluators scoring the RFP had no clear understanding of the scoring process and how points were to be assigned based on the evaluation criteria prior to conducting evaluations;

g.     Defendant Metro sought out and relied on a range of independent and subjective opinions, rather than establishing a common standard by which the proposals could be evaluated;

h.     The RFP and technical proposal scoring process provided no fair basis of comparison among bidders; and

i.     Throughout the technical proposal phase, Defendant Metro treated Plaintiff BFW differently than Defendant Goodwill.

66.     Defendant Metro entered into a contract with Goodwill pursuant to the 2015 Award of Project 08-15 prior to the completion of Plaintiff's BFW's protest.

67.     By entering into the contract without permitting Plaintiff BFW to complete the protest process set forth by the FTA, Federal law, State and the Defendant Metro's own procedures, the Defendant Metro discriminated against Plaintiff BFW.

**COUNT I: METRO VIOLATED NEB. REV. ST. §§ 73-101 AND 14-1816**

68.     Plaintiff hereby incorporate by reference all the preceding paragraphs.

69.     Neb. Rev. St. § 73-101 provides that the purposes of the Nebraska procurement statutes include establishing a standardized, open, and fair process for selection of contractual services.

70.     Defendant Metro failed to afford Plaintiff BFW fair and equal consideration of its proposal during Defendant Metro's consideration, selection and award of 2015 Award of Project 08-15, because:

a.     Defendant Metro selectively permitted evaluators to add an independent consultant and CPA to audit and review Plaintiff BFW's financials but not any other bidder; and

17

b.      Defendant Metro's evaluation of Plaintiff BFW's technical proposal, including Defendant Metro's identification of deficiencies therein, was arbitrary and capricious, lacked a rational basis, and violated state and Federal regulations and procedures.

71.      Neb. Rev. Stat. § 14-1816 prohibits any member of the board, officer, or employee from having any private financial interest, profit, or benefit in any contract, work, or business of the Defendant Metro.

72.      Haase has an interest in maintaining a great and profitable relationship between Defendant Metro and Defendant Goodwill.

73.      During the relevant period, Haase, sitting as chair of Metro's Board at the July 23 meeting, and her firm had a very close and long relationship with Goodwill.

74.      There is at least the appearance of an improper relationship between Defendant Metro, Haase, and Defendant Goodwill that fatally taints this procurement wholly independent of the unlawful unfairness demonstrated above.

75.      During the relevant period, Haase, sitting as chair of Metro's Board at the July 23 meeting, and her firm had a very close and long relationship with Goodwill.

76.      Defendant Metro's Board of Directors member's apparent personal conflict of interest involving Metro's incumbent contractor stemmed from two (2) equity business partners and Directors at the same architectural design firm serving as Board members for two (2) separate organizations' Boards of Directors. One partner served on Metro's Board of Directors and the other served on Metro's incumbent transit fleet interiors cleaning services contractor Board of Directors. The two architectural firm business partners have ownership interests in the

architectural design firm and one of the firm's primary corporate client is Metro's incumbent transit fleet interiors cleaning services contractor.

77.     Despite this appearance of a conflict of interest, this individual was allowed to be the critical vote in awarding the contract to Defendant Goodwill.

78.     Defendant Goodwill also made misrepresentations of material fact that intentionally caused a likelihood of misunderstanding as to the approval of certain services by Defendant Metro.

79.     Defendant Metro knew of the apparent conflict of interest and did not require Defendant Goodwill to disclose.

80.     Furthermore, Defendant Metro and Defendant Goodwill partnered to establish cleaning protocol, procedures and performance specifications for the transit fleet interiors cleaning work.

81.     During the bidding process, Defendant Metro was unable to locate its files documenting the cleaning protocol, procedures, and performance specifications for the transit fleet interiors the Union #554 members followed in the performance of their transit fleet interiors cleaning duties.

82.     Defendant Goodwill had an advantage that was not available to Plaintiff BFW when bidding in 2013 nor during the technical proposal in 2015.

83.     The Defendant's award of contract in violation of federal law was illegal and such awards are therefore void.

84.     Despite this appearance of a conflict of interest,  Haase was allowed to be the critical vote in awarding the contract to Goodwill. Defendant Goodwill,  and Metro violated

Plaintiff BFW's rights by voting in favor of awarding the contracts to Goodwill, despite their conflicts of interest, as such the Goodwill contract was awarded contrary to law and is void.

### CLAIM II: DISCRIMINATION ON THE BASIS OF RACE 42 U.S.C. § 1981

85.     Plaintiff hereby incorporate by reference all the preceding paragraphs.

86.     Defendant Metro has never contracted with a minority-owned business for the cleaning of transit-fleet interiors, and Metro—by and through its directors and agents—treated Plaintiff differently due to Plaintiff's race to ensure that Plaintiff did not qualify to bid for the transit-fleet interior cleaning contract.

87.     Defendant Metro intentionally and flagrantly failed to abide by the nondiscrimination requirements of Metro's Master Agreement with FTA, in violation of Metro's requirements under federal law and in breach of Metro's agreement with FTA.

88.     Metro's failure to abide by the terms of its agreement with FTA, and Metro's concomitant racial discrimination against Plaintiff, prevented Plaintiff from bidding on or being considered for a contract worth over $1.4 million.

### CLAIM III: DISCRIMINATION ON THE BASIS OF RACE 42 U.S.C. § 2000(d)

89.     Plaintiff hereby incorporate by reference all the preceding paragraphs.

90.     This racial discrimination is in violation of 42 U.S.C. § 2000d, which prohibits exclusion from participation in federally assisted programs, and wherein compensatory and punitive damages may be awarded.

### COUNT IV –RETALIATION AGAINST PROTECTED ACTIVITES

91.     Plaintiff hereby incorporate by reference all the preceding paragraphs.

92.     Defendant Metro, during the course of its procurement activities associated with the referenced projects, used methods of administration to retaliate against Plaintiff BFW's for

previously filed written complaint, protest and protest appeal (i.e. Protected Activities) regarding Project 08-13.

93.     The procurement requirements contained in Metro's Master Agreement with the FTA were used as pretext to find BFW's unpriced Technical Proposal "unacceptable" before the first step (i.e., Review of Technical Qualifications and Approach step) of its two-step procurement procedure.

94.     Defendant Metro's act in denying Plaintiff BFW the opportunity to compete for a business opportunity under the RFP solicitation for Project 08-15 was an act of reprisal against Plaintiff for exercising its right to Mixed Free Speech through the filing of protests (Protected Activities) under Project 08-13 violating Federal Anti-Retaliation Law and may have violated BFW's equal opportunity rights under Title VI of the Civil Rights Act of 1964 and related statues.

WHEREFORE, Plaintiff pray for judgment of this Court as follows:

A.  A declaratory judgment declaring the contract between Defendant Metro and Defendant Goodwill void;

B.  An award of compensatory damages for lost profits;

C.  Punitive damages;

D.  Attorneys' fees and costs incurred in the furtherance of this litigation; and

E.  Any other relief that this Court deems just and proper.

DATED this April 6, 2018.

**BJ'S FLEET WASH,**

By: _____
Justin T. Wayne - #23310
Attorney for Plaintiff
Law Office of Justin T. Wayne, LLC
P.O. Box 265
Omaha, NE  68101
(402) 215-4024