# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BJ'S FLEET WASH, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>TRANSIT AUTHORITY OF THE CITY OF OMAHA; and GOODWILL INDUSTRIES, INC., Serving Eastern Nebraska and Southwest Iowa a Nonprofit Organization,<br><br>Defendants. | 8:17CV23<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the Motion for Summary Judgment, ECF No. 134, filed by Defendant Transit Authority of the City of Omaha (Metro), and the Motion for Summary Judgment, ECF No. 136, filed by Defendant Goodwill Industries, Inc., Serving Eastern Nebraska and Southwest Iowa a Nonprofit Organization, (Goodwill). For the following reasons, the motions will be granted.

## BACKGROUND

The parties, in their briefs, provided numbered paragraphs of facts with pinpoint citations to admissible evidence in the record, in compliance with NECivR 56.1[1] and

---

[1] *See* NECivR 56.1(b)(1):

> The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. Each material fact in the response must be set forth in a separate numbered paragraph, must include pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other material upon which the opposing party relies, and, if applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed. <u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.</u>

Federal Rule of Civil Procedure 56. Unless otherwise stated, the following facts are those that appear uncontested.

Metro is a political subdivision established under Nebraska law[2] to provide public transportation to the Omaha metropolitan area. Metro receives federal funding pursuant to the Federal Transit Act, 49 U.S.C. § 5301 *et seq.* Metro is governed by a five-person board of directors appointed by the Mayor of Omaha.

Amy Haase is a member of Metro's board of directors. Haase has been an equity owner of the design and architectural firm RDG Planning & Design (RDG) since at least 2002. She works as an urban planner for RDG. She was a partner in 2012 and is currently a principal. RDG did design work for Goodwill from 2009–14. Haase did not provide services to Goodwill, nor did Goodwill ever request services from RDG's urban planning division. RDG has not provided services to Goodwill since 2014.

Metro maintains a fleet of approximately 150 city buses and maintains covered shelters at approximately fifty stops throughout the Omaha Metropolitan Area. Prior to 2009, Metro employees cleaned, serviced, and maintained the buses and shelters. In 2009, Metro contracted with Goodwill for the cleaning of the bus interiors and covered shelters. After the contract expired in October 2012, Goodwill continued to perform the work on a month-to-month basis for approximately two years.

In 2013, Metro issued a Request for Competitive Proposals (RFCP) for the cleaning of the city bus interiors and covered shelters (Project 08-13). Metro received

---

[2] Neb. Rev. Stat. § 14-1801 *et seq.*

four bids for Project 08-13. Goodwill submitted a bid. Plaintiff BJ's Fleet Wash, LLC[3] (BFW), whose sole member, Rodney Johnson, is African-American submitted a bid as well. During a board meeting on June 27, 2013, Metro staff recommended to the board of directors that Project 08-13 be awarded to Goodwill. At that meeting, BFW and one other bidder raised an issue with the quality of the work currently being done by Goodwill and expressed concern that disadvantaged business entities were not given credit under the RFCP criteria.

BFW filed a formal pre-award protest on July 23, 2013. The protest raised two primary complaints and requested that Goodwill be excluded from competing. First, BFW argued that Metro and Goodwill had an organizational conflict of interest because of their ongoing relationship. BFW claimed that because of this relationship, Goodwill set the scope and specifications of the work which eventually came to be Project 08-13, giving Goodwill an unfair advantage. Second, BFW argued that Metro did not follow Federal Transit Administration regulations regarding disadvantaged business entities and small businesses. On July 30, 2013, Metro's Executive Director, Curt Simon, rejected BFW's protest. On August 5, 2013, BFW appealed Simon's rejection to Metro's board of directors. On August 20, 2013, then-chairman, Michael Young, responded to BFW's appeal and informed BFW that the board intended to reject all bids. On September 5, 2013, Metro's board publicly announced that it would reject all bids for Project 08-13 and it intended to issue a new request for proposals. Haase voted in favor of rejecting all bids.

---

[3] At the time of bidding for Project 08-13, Johnson was doing business as a sole proprietor under the name of BJ's Mobile Wash and owned a corporation called BJ's Unlimited Enterprises, Inc. However, it is uncontested that the entity is now BJ's Fleet Wash, LLC.

3

On April 13, 2015, Metro issued an invitation to bid for cleaning services of its transit centers and bus stop shelters (Project 03-15). Two bids were received for Project 03-15—one from BFW and one from Goodwill. On May 28, 2015, Metro's board awarded BFW the contract for Project 03-15. Haase voted in favor of the award.

On May 29, 2015, Metro issued an RFP for the cleaning of the transit fleet interiors (Project 08-15). This bid was to be a two-step process. The first step was to be an unpriced bid in order to determine whether a bidder was considered a "responsible bidder." Whether the bidder was responsible was determined by the bidder's technical proposal, past performance, reputation, financial capabilities, and other criteria. Metro then would allow bidders it considered qualified to submit a priced technical bid.

Metro received two first-step bids for Project 08-15—one from BFW and one from Goodwill. These bids were reviewed by an evaluation committee composed of three internal representatives: one member from Metro's marketing department, one from its maintenance department, and one from its custodial department; and two external representatives: one from the University of Nebraska Omaha, and one from the Omaha-Council Bluffs Metropolitan Area Planning Agency. The evaluators graded the bids on four weighted criteria: 1) experience and qualifications of the offeror firm and staff to perform the tasks (35%); 2) adequacy of proposed project management and resources to be utilized (25%); 3) adequacy of character, reputation, judgment, and past performance—including references (20%); and 4) adequacy of financial resources and capability of the offeror to fully implement and perform the work (20%). ECF No. 135-20. The evaluation committee determined that BFW was not a qualified bidder—each evaluator citing concern for BFW's financial resources. ECF Nos. 135-14, 135-15, 135-

4

16, 135-17, 135-18. On July 2, 2015, Metro asked its independent auditor, Hayes & Associates, LLC (Hayes), to perform an independent evaluation of BFW. Hayes informed Metro that it was concerned that BFW lacked financial wherewithal and did not have enough infrastructure, resources, and cash flow to handle the contract. ECF No. 135-19.[4]

Metro determined that BFW was not qualified to advance to the second step of the bidding process. Metro informed Johnson of BFW's rejection on July 2, 2015. BFW appealed the rejection to Simon on July 7, 2015. On July 8, 2015, Simon denied the appeal. On July 12, 2015, Johnson emailed Simon and other Metro staff withdrawing "any and all complaints or protest[s]" because he "realize[d] that [Project 08-15] may [have been] too big of a bite for [his] company to chew . . . ." ECF No. 135-21. Metro's board of directors awarded Project 08-15 to Goodwill on July 23, 2015. Haase voted in favor of the award.

On January 25, 2017, BFW and Johnson "individually and in his official capacity" brought a lawsuit against Metro, Goodwill, Haase, and Joseph Lang—a board member for Goodwill and equity owner of RDG. Compl., ECF No. 1. On May 12, 2017, BFW and Johnson filed a fourteen-count Amended Complaint against the same defendants. First Am. Compl., ECF No. 24. On May 22, 2017, Haase and Metro filed a Motion to Dismiss, ECF No. 25, and on May 26, 2017, Lang and Goodwill filed a Motion to Dismiss, ECF No. 32. The Court granted Haase and Metro's Motion and partially granted Lang and Goodwill's Motion. Mem. & Order, ECF No. 48. The Court dismissed ten counts of the

---

[4] The final weighted scores for the first-step bids were as follows: BFW, 6.8; Goodwill, 9.5. In the area of financial adequacy, BFW scored a 3.6.

5

Amended Complaint, dismissed Haase and Lang as defendants, and dismissed all claims brought by Johnson "individually and in his official capacity." Mem. & Order, ECF No. 48. On April 6, 2018, BFW filed a Second Amended Complaint (SAC)[5] in conformity with the Court's prior Order. SAC, ECF No. 80. On August 7, 2019, Metro filed a Motion for Summary Judgment, ECF No. 134, and Goodwill filed a Motion for Summary Judgment, ECF No. 136. Both Defendants seek dismissal of the remaining claims.

## STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "Summary judgment is not disfavored and is designed for every action." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir.

---

[5] The current Complaint is captioned "Amended Complaint for Declaratory Judgment, Damages, and Attorney Fees," but the Court will refer to it as the SAC.

6

2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party need not produce evidence showing "the absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 325). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than the mere existence of some alleged factual dispute" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Wagner*, 788 F.3d at 882 (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue of material fact" for trial

and summary judgment is appropriate. *Whitney*, 826 F.3d at 1076 (quoting *Grage v. N. States Power Co.-Minn.*, 813 F.3d 1051, 1052 (8th Cir. 2015)).

**DISCUSSION**

BFW's SAC contains four counts. In Count I, BFW asserts that a member of Metro's board of directors, Haase, had a prohibited conflict of interest with Goodwill in violation of state law. Goodwill remains a party to this case "unless and until BFW's conflict-of-interest claim has been dismissed with prejudice" pursuant to the Court's previous Memorandum and Order, ECF No. 48. Counts II and III allege that Metro discriminated against BFW on the basis of race in violation of several federal statutes. Count IV alleges that Metro retaliated against BFW in violation of its First Amendment rights to free speech and petition.

**I.   Violation of Neb. Rev. Stat. § 14-1816[6]**

Count I of the SAC alleges Haase and Metro had an indirect conflict of interest with Goodwill in violation of Neb. Rev. Stat. § 14-1816. Metro argues that BFW does not have standing as a taxpayer to bring such a claim and that the text of section 14-1816 does not prohibit indirect conflicts. BFW does assert taxpayer standing and, assuming for purposes of this motion that section 14-1816 does prohibit indirect conflicts of interest, BFW fails to show evidence from which a reasonable jury could find that Haase had a conflict of interest. Defendants are entitled to summary judgment and Count I will be dismissed, with prejudice.

*A. Standing*

---

[6] Count I alleges a violation of Neb. Rev. Stat. § 73-101 and § 14-1816. The Court previously dismissed the claim as it relied on § 73-101 and will limit its discussion to the alleged violation of § 14-1816.

8

In Nebraska, "[a] resident taxpayer, without showing any interest or injury peculiar to itself, may bring an action to enjoin the illegal expenditure of public funds raised for governmental purposes." *Chambers v. Lautenbaugh*, 644 N.W.2d 540, 548 (Neb. 2002) (citing *Fitzke v. City of Hastings*, 582 N.W.2d 301, 308 (Neb. 1998)). To assert this standing, "a resident taxpayer must also allege a demand made upon the municipal or public corporation and that the demand was refused, or facts which show that such a demand would be useless." *Id.* (citing *Fitzke*, 582 N.W.2d at 308).

Metro is funded in part by local property taxes through the City of Omaha and Douglas County. Neb. Rev. Stat. §§ 14-1805(17), 14-1821, 77-3443, 77-3444. According to Johnson, BFW is headquartered in Omaha and pays annual property taxes on its equipment. Johnson Aff. ¶ 6, ECF No. 151-2. Although BFW does not own real estate, it does appear to own depreciable tangible personal property—equipment—which is subject to property taxes. 350 Neb. Admin. Code § 20-001.02; Pl.'s Ex. 17 16, ECF No. 154-2. Therefore, BFW is a resident taxpayer.

To properly assert taxpayer standing, BFW must allege that it made a demand upon Metro or show that such a demand would be useless. BFW did not allege that it made a demand of Metro regarding the alleged conflict of interest, therefore, BFW cannot assert standing unless it can show that making such a demand would have been useless.

The Nebraska Supreme Court has noted that if the public entity appears as a defendant and resists the plaintiff's claims, this is evidence that the demand would have been useless. *See Darnell v. City of Broken Bow*, 299 N.W. 274, 287 (Neb. 1941) ("[T]he fact that the defendant city appeared and answered, and is resisting plaintiff, establishe[s] as a fact that the making of a demand . . . would have been an idle ceremony." (citing

9

*Taxpayers League of Wayne Cty. v. Wightman*, 296 N.W. 886 (Neb. 1941))). However, since *Darnell*, the Nebraska Supreme Court has established a presumption that "[p]ublic officers are always . . . ready and willing to perform their duty;" therefore, a demand is presumed not to be useless, even if the public entity is a defendant in the case. *Lake v. Piper, Jaffray & Hopwood, Inc.*, 324 N.W.2d 660, 663 (Neb. 1982) (quoting *Reiter v. Wallgren*, 184 P.2d 571, 573 (Wash. 1947)). In order to rebut this presumption, a plaintiff must show that the public entity has "done something wrong, that it was pointed out to [the public entity], and that it would have rejected this demand." *Id.*

BFW does so here. Although it does not allege that it made an official demand upon Metro, it does provide evidence that such a demand would be useless. BFW shows that it made its objections known to Metro's chairman, Michael Young. BFW's counsel contacted Young and informed him that BFW believed Haase had a conflict of interest, that the contract must be rescinded and rebid, and that Haase must abstain from voting. Young Dep. 115:13–116:9; 147:10–150:24, ECF No. 151-3. Young informed the rest of the board of BFW's objections. Young Dep. 115:13–21, ECF No. 115-3. That evidence, along with Metro's current position as a defendant resisting BFW, establishes that it would have been useless for BFW to make a demand prior to bringing this action. *See Fitzke*, 582 N.W.2d at 308 (finding that although the plaintiff did not allege that it made a demand upon the public defendants, evidence that the defendants took action over the plaintiff's objections sufficed to show that such a demand would be useless). BFW has shown that making a demand of Metro would have been useless. Therefore, BFW has properly asserted taxpayer standing to challenge the contract.

*B. Conflict of Interest*

BFW argues that Haase had a conflict of interest with Goodwill at the time she voted to award Project 08-15 to Goodwill because she is an equity owner of RDG. RDG has provided services for Goodwill in the past, and BFW argues that Haase stood to benefit financially by awarding a contract to a possible future client. BFW claims that Haase has a prohibited financial interest in providing Goodwill with business so that Goodwill might have the financial resources to build more retail locations in the future and the incentive to hire RDG in order to return the favor to Haase. This, BFW argues, is an improper financial interest because Haase, as an equity owner of RDG, would receive financial compensation from such a project.

A plaintiff alleging a contract is void due to a conflict of interest "must introduce evidence to show by a preponderance that a prohibited interest existed at the time the [contract] was executed." *Jeffrey Lake Dev., Inc. v. Cent. Neb. Pub. Power & Irrigation Dist.*, 633 N.W.2d 102, 111 (Neb. 2001). Conflict of interest statutes such as section 14-1816 are "declaratory of the common law, and of public policy, which declare that such contracts [entered into despite a conflict of interest] are void." *Davy v. Sch. Dist. of Columbus*, 222 N.W.2d 562, 564 (Neb. 1974) (quoting *Arthur v. Trindel*, 96 N.W.2d 208, 215 (Neb. 1959)). Under these statutes, an indirect conflict of interest "depends on a showing that a potential for a conflict of interest exists." *Jeffrey Lake*, 633 N.W.2d at 110 (citing *Wyzykowski v. Rizas*, 626 A.2d 406, 413 (N.J. 1993) ("An actual conflict of interest is not the decisive factor, nor is whether the public servant succumbs to the temptation, but rather whether there is a potential for conflict."); *Delta Electric Constr. Co. v. City of San Antonio*, 437 S.W.2d 602, 609 (Tex. Civ. App. 1969) ("[I]f there is a potential conflict, the contract is invalid."); *Griggs v. Princeton Borough*, 162 A.2d 862, 869 (N.J. 1960) ("[I]t

is the existence of such interests which is decisive, not whether they were actually influential.")). The existence of a conflict of interest is a question of fact. *Id.* (citing *Copple v. City of Lincoln*, 274 N.W.2d 520 (Neb. 1979)). For Defendants to be entitled to summary judgment, there must be no evidence in the record from which a reasonable jury could find an indirect conflict of interest existed at the time the contract was executed.

The parties dispute the application of *Copple* and *Jeffrey Lake*[7] to the present facts. In *Copple*, the City of Lincoln and Lancaster County were considering several rezoning plans to establish a shopping center. *Copple*, 274 N.W.2d at 522. There were two plans pending: one that included the plaintiff's land and one that included land owned by a partnership of which a city councilmember (Cook) was a partner. *Id.* The City Planning Commission submitted the latter comprehensive development plan to the Lincoln City Council and Lancaster County Board of Commissioners. *Id.* The City Council and County Board independently approved of the plan. *Id.* The plaintiff challenged the validity of the City Council's vote, alleging that Cook had a conflict of interest. *Id.* The Nebraska Supreme Court ultimately agreed with the findings of the district court that "Cook's participation was minimal and . . . his interest was not an immediate and direct pecuniary interest. Under these facts and circumstances we find that Cook's conflict of interest, if any, was not sufficient to disqualify his vote . . . ." *Id.* at 528.

---

[7] Both *Copple* and *Jeffrey Lake* applied prohibitions against direct and indirect conflicts of interest. *See Jeffrey Lake*, 633 N.W.2d at 110 ("No member of the board of directors shall be interested, directly or indirectly, in any contract to which the district . . . is a party . . . ." (quoting Neb. Rev. Stat. § 70-642.02)); *Copple*, 274 N.W.2d at 525 ("If any councilman . . . has a significant financial interest, direct or indirect, . . . in any action of the city government relating to the public or private development of land . . . he shall declare that interest and shall refrain from voting upon or otherwise participating in . . . the action in which he has a financial interest." (quoting Lincoln Mun. Code § 2.08.010 (1959))).

In *Jeffrey Lake*, two private entities, Jeffrey Lake Development, Inc. (Jeffrey Lake) and Midway Wildlife and Recreation Club (Midway), held leases from the Central Nebraska Public Power and Irrigation District (Central). *Jeffrey Lake*, 633 N.W.2d at 516–17. Central sought to change the terms of the leases unilaterally to begin charging rent from the sublessees. *Id.* at 517. Central also sought to terminate the leases if the parties did not agree to the modification. *Id.* at 518. Jeffrey Lake and Midway brought an action against Central to enforce their rights; Central cross-claimed that the lease with Jeffrey Lake was invalid due to a conflict of interest of one of Central's directors. *Id.* Central argued that there was a conflict of interest because at the time the initial lease between Central and Jeffrey Lake was executed, a member of Central's board of directors (Hargleroad) was subleasing a lot from Jeffrey Lake. *Id.* at 524. The Nebraska Supreme Court found no conflict of interest because the evidence only showed that "Hargleroad was simultaneously a member of Central's board of directors and a sublessee of [Jeffrey Lake's]." *Id.* at 525. Importantly, "Central [did] not show[] what powers Hargleroad had as a director that would give him the ability to influence the terms of a sublease between [Jeffrey Lake] and a sublessee." *Id.*

Here, as in *Copple* and *Jeffrey Lake*, the question is whether Haase had an indirect conflict of interest in the contract. In both cases, the court found there was no prohibited interest because the asserted interest was too attenuated, and the purportedly conflicted party did not have the means to (or did not) assert control over the process. Here, the relationship between Haase and Goodwill is even more attenuated. In *Copple* and *Jeffrey Lake*, the interested parties owned or subleased the land at issue. The official actions taken by the city of Lincoln and Central had the potential to increase the value of these

13

interests in land. But the mere potential of a future increase in value was not enough for the court to find even an indirect conflict of interest. Here, at the time of contracting, RDG did not have a relationship with Goodwill, nor was it bidding for work or otherwise trying to gain business from Goodwill. Further, BFW does not point to any evidence showing that Haase had the ability to influence the bidding process. The record shows that Haase's involvement in the bidding process was limited to her vote to reject all bids for Project 08-13 and her votes to award Project 03-15 to BFW and Project 08-15 to Goodwill upon recommendation of Metro's staff. For these reasons, BFW has failed to show that there is evidence in the record from which a reasonable jury could find an indirect conflict of interest existed at the time the contract was executed. Defendants are therefore entitled to summary judgment, and Count I of the SAC will be dismissed, with prejudice.

## II.     Discrimination on the Basis of Race in Violation of 42 U.S.C. § 1981[8] and Title VI

Counts II and III of the SAC allege discrimination on the basis of race in violation of 42 U.S.C. § 1981 and Title VI, 42 U.S.C. § 2000d. Section 1981 protects the rights of citizens to make and enforce contracts. Title VI protects citizens against discrimination by any program or activity receiving federal funding. In the Eighth Circuit, courts analyze violations of § 1981 and Title VI through the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 937 (8th Cir. 2019) (applying *McDonnell Douglas* framework to a § 1981 claim); *Freeman v. Fahey*, 374 F.3d 663, 666 (8th Cir. 2004) (applying

---

[8] The Court construes the § 1981 claim as having been properly brought under § 1983. *See Lockridge v. Bd. of Trs. of Univ. of Ark.*, 315 F.3d 1005, 1007 (8th Cir. 2003) (holding § 1981 claims against state actors must be brought under § 1983, and liberally construing the complaint as asserting a § 1981 claim under § 1983).

*McDonnell Douglas* framework to a Title VI claim). Under the *McDonnell Douglas* framework, a plaintiff must first make a prima facie showing of discrimination. *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015) (citing *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003)). If the plaintiff satisfies this burden, the defendant must produce evidence of a legitimate, non-discriminatory reason for the challenged action. *Id.* (citing *Putman*, 348 F.3d at 735). If the defendant makes such a showing, the plaintiff then must prove that the defendant's reasoning is a pretext for unlawful discrimination. *Id.* (citing *Putman*, 348 F.3d at 735).

To establish a prima facie case "a plaintiff must show: '(1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant.'" *Combs v. Cordish Companies, Inc.*, 862 F.3d 671, 681 (8th Cir. 2017) (quoting *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 (8th Cir. 2009) (en banc)). The plaintiff may show the defendant's discriminatory intent by showing that the defendant treated the plaintiff differently from similarly situated nonmembers of the protected class. *Harris v. Hays*, 452 F.3d 714, 718 (8th Cir. 2006) (citing *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005)); *see also Combs*, 862 F.3d at 681 ("Intentional race discrimination may be proven by either direct or circumstantial evidence.") (citing *Putman v. Unity Health Sys.*, 348 F.3d 732, 734 (8th Cir. 2003)).

To establish a prima facie case of discrimination, BFW must show that it was engaging in a protected activity and that Metro interfered with BFW's protected activity because of BFW's membership in a protected class. *See Combs*, 862 F.3d at 681. The parties agree that BFW is a member of a protected class because BFW's sole owner is

African-American.[9] BFW was actively seeking to contract with Metro, which is undoubtedly a protected activity. *Gregory*, 565 F.3d at 470.[10] The unlawful interference element requires a plaintiff to show that the defendant "thwarted" or "block[ed] the creation of a contractual relationship." *Withers v. Dick's Sporting Goods, Inc.*, 636 F.3d 958, 965 (8th Cir. 2011) (internal quotations omitted). Metro blocked BFW's ability to engage in protected activity when it denied BFW the opportunity to submit a priced bid for Project 08-15. Therefore, in order to establish a prima facie claim, BFW must show that Metro did not allow BFW to bid *because* of BFW's membership in a protected class.

Discriminatory intent may be shown by direct or circumstantial evidence. *Combs*, 862 F.3d at 681. Although the Eighth Circuit has not modified the *McDonnell Douglas* standard for public bidding cases, the modifications adopted by the First and Eleventh Circuits are instructive. In the First Circuit, a public bidder may prove intentional discrimination by showing that,

> (i) [it] is a minority-owned firm; (ii) [its] bid met the specifications required of those competing for the contract; (iii) [its] bid was significantly more advantageous to the [public entity] than the bid actually awarded, whether in terms of price or some other relevant factor; and (iv) the [public entity] selected another contractor.

*T&S Serv. Assocs., Inc. v. Crenson*, 666 F.2d 722, 725 (1st Cir. 1981). The Eleventh Circuit's modification is similar. It states that a public bidder establishes a prima facie

---

[9] Although the Eighth Circuit and Supreme Court have not held that a corporate entity may possess a racial identity, the Eighth Circuit has stated that such entities may have standing to assert racial discrimination claims. *See Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 880–82 (8th Cir. 2003).

[10] Metro seems to dispute this, saying that *Gregory*'s "requirements that plaintiff 'actively sought to enter into a contract' and was 'thwarted' by the defendant is [sic] clearly inappropriate in the context of public bidding." Def.'s Reply Br. 23, ECF No. 171. While this may be a reference to the retail nature of *Gregory* in contrast to the public bidding nature of this case, it is clear that BFW was actively seeking to contract with Metro through the public bidding process. Section 1981 protects this activity.

claim by showing that it "is a member of a minority group, that [it] submitted an application or bid which met the requirements for an available contract, that the application or bid was ultimately rejected, and that the contract was eventually given to an individual [or entity] who is not a member of a protected class." *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 187 (1989)). Therefore, a plaintiff may show intent in a public bidding case by showing that a minority plaintiff was not awarded a contract that it met the requirements for, and that the recipient of the contract was not a member of a protected class.

BFW argues that it met the requirements for Project 08-15, but Metro awarded the contract to Goodwill, which BFW argues is not a member of a protected class. *See* ECF No. 158-2. It does not appear that BFW met the requirements, however. Although Metro did not set a minimum standard for first-step bids, nor did it state that any single criterion was dispositive, the RFP for Project 08-15 stated that "only those bidders whose unpriced Proposals [were] determined to be acceptable during the first phase will have their priced bids requested and considered." ECF No. 80-3. The evaluation committee was unanimously concerned by the state of BFW's finances. By Johnson's own admissions BFW was not financially able to handle the project. Johnson admitted in his email to Metro that "this project may [have been] too big of a bite for [his] company to chew." ECF No. 135-21. Johnson went on to say that he wholeheartedly believed that the review committee had his best interests in mind and gave him honest advice. ECF No. 135-21. Therefore, BFW was not a qualified bidder and fails to establish a prima facie case of discrimination under the *McDonnell Douglas* standard.

17

Even assuming BFW established a prima facie case, it cannot show that Metro's legitimate, non-discriminatory reasons for not awarding the contract to BFW were pretextual. It is not enough for BFW to show that the Metro's explanations are simply false in some way, it must show that they are "pretext for *unlawful discrimination* . . . ." *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017 (8th Cir. 2005) (emphasis in original). Metro argues that each step it took was intended to procure the best option for Metro and provide fairness and clarity to the bidders. Metro further argues that it was important to determine the qualifications of bidders before allowing them to provide a priced bid because the price alone would not be determinative in awarding the contract. Finally, Metro argues that BFW was not selected because the evaluation committee determined BFW was unfit to proceed based on the committee's review of BFW's financial statements and an independent audit done by Hayes.

BFW argues that these legitimate, nondiscriminatory reasons are pretext because Metro wanted to award the work to Goodwill. BFW takes issue with every step of the process, and each of its arguments revolves around an asserted favoritism by Metro toward Goodwill. First, BFW argues that by combining the fleet interior washing with the covered shelter washing in Project 08-13, Metro intended to award both to Goodwill. Next, BFW argues that Metro showed favoritism to Goodwill by rejecting all bids for Project 08-13, because it was aware that Goodwill would continue on a month-by-month basis providing these services. BFW also argues that Metro inflated the cost estimate of the project to mislead reviewers as to the financial requirements of Project 08-15 to assist Goodwill in getting the project. Even if all BFW's allegations were true, they only show that Metro's explanations are pretext for favoritism to Goodwill—not unlawful

18

discrimination.  *See Strate*, 398 F.3d at 1017.  Therefore, Metro will be granted summary judgment and Counts II and III of the SAC will be dismissed.

## III. Retaliation Against Protected Activities

Count IV of the SAC alleges that Metro retaliated against BFW for protesting Project 08-13 in violation of the First Amendment.[11]  BFW may not bring a First Amendment retaliation claim under Supreme Court and Eighth Circuit precedent.  The Supreme Court extended the First Amendment retaliation cause of action for government employees to include government contractors with a pre-existing commercial relationship with the government in *Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996), and to regular providers of services in *Umbehr*'s companion case, *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712 (1996).  Thus the "threshold issue is whether [the plaintiff] had either a pre-existing commercial relationship with the city, or was a regular provider of services to it."  *Heritage Constructors, Inc. v. City of Greenwood*, 545 F.3d 599, 601 (8th Cir. 2008).  More specifically, the contract at issue must be the subject of the pre-existing relationship.  *See Umbehr*, 518 U.S. at 685 ("Because Umbehr's suit concerns the termination of a pre-existing commercial relationship with the government, we need not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship."); *compare McClintock v. Eichelberger*, 169 F.3d 812 (3d Cir. 1999) (affirming the district court's dismissal because the plaintiff did not have a pre-existing commercial relationship with the government), *with Oscar*

---

[11] Count IV of the SAC mentions Title VI and "related statutes," but does not allege such a retaliation claim, nor does BFW argue a retaliation claim under Title VI in its brief.  To the extent that such a claim is alleged, it is dismissed, with prejudice.

19

*Renda Contracting, Inc. v. City of Lubbock*, 463 F.3d 378, 380 (5th Cir. 2006) ("[T]he absence of a prior relationship would not preclude the contractor's claim.").

Although BFW was later awarded Project 03-15, it does not assert that Metro terminated a pre-existing commercial relationship. In fact, a commercial relationship did not exist until almost two years after BFW petitioned Metro regarding Project 08-13. Therefore, BFW cannot bring a First Amendment retaliation claim against Metro. Metro will be granted summary judgment, and Count IV of the SAC will be dismissed, with prejudice.

Accordingly,

IT IS ORDERED:

1. Defendant Transit Authority of the City of Omaha's Motion for Summary Judgment, ECF No. 134, is granted;

2. Defendant Goodwill Industries, Inc.'s Motion for Summary Judgment, ECF No. 136, is granted;

3. This action is dismissed, with prejudice; and

4. A separate judgment will be entered.


Dated this 20th day of November, 2019.

BY THE COURT:

s/Laurie Smith Camp
Senior United States District Judge